## AFFIDAVIT OF SPECIAL AGENT MARK TULLY

Special Agent Mark Tully deposes and states as follows:

### A.  INTRODUCTION

1.      I am a Special Agent with the DEA and have been so employed for the past 9
years.  I have been assigned to the Boston Office of the New England Division for the past four
years.  Prior to that I was assigned to the New York Division.  Prior to my employment with the
DEA, I was an officer of the United States Army for approximately three years, assigned as an
Air Defense Artillery Officer at Fort Drum, New York.  My primary duties at the DEA include
the investigation of organized narcotics traffickers.  I have been involved in approximately one-
hundred investigations involving the organized domestic and international importation and
distribution of kilogram quantities of cocaine and heroin.  Approximately twenty of those
investigations involved the use of court ordered electronic surveillance.  I was the affiant for
Federal Title III applications in six of those investigations.  Those investigations resulted in the
arrest and the prosecution of various distribution, transportation, and supply groups based in
Colombia and the Dominican Republic operating in the states of Massachusetts and New York.
Those investigations resulted in the seizure of large quantities of drugs.  I have testified in the
grand jury and in approximately ten trials in the United States District Court for the District of
Massachusetts, the District of Maine, the Southern District of New York, and the Eastern District
of New York.

2.      During the course of my law enforcement career, I have written and/or
participated in the execution of numerous search warrants. In a substantial number of residential
searches executed in connection with the drug investigations in which I have been involved, the
following kinds of drug-related evidence have typically been recovered: (a) controlled
substances, such as cocaine; (b) paraphernalia for packaging, processing, diluting, weighing, and
distributing controlled substances, such as scales, rubber gloves, funnels, sifters, grinders, glass
panes and mirrors, razor blades, plastic bags, heat-sealing devices, as well as cutting material to

1

dilute the potency of the controlled substance; (c) books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances; (d) personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to individuals involved in the distribution of controlled substances; (e) cash, currency, and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, and checkbooks; (f) specially manufactured hidden compartments known as "hides" that are used to store drugs and drug proceeds and which are at time electronically controlled and operated; and (g) firearms and other dangerous weapons.

3.      In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

4.      Based upon my training and experience, as well as the knowledge and experience of other agents and police officers in my office, I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia (as described above) in their residences. Further, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also typically be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s).

2

Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to conduct their drug trafficking business efficiently.

5.    It is also a generally common practice for traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

6.    Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

7.    My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from the following: (a) my own involvement in prior drug investigations and searches during my career as a law enforcement officer, as previously described in the training and qualifications portion of this affidavit; (b) my involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations, more particularly described below; (c) from this particular investigation and other investigations involving the interception of wire communications pursuant to a court authorized Title III wiretap.

1.    **This Investigation**

8.    I have personally participated in the investigation of the subjects identified in this Affidavit since August 2004.  I am familiar with the facts and circumstances of this  investigation from oral and written reports made to me by other Agents of the DEA, other federal, state and local

3

law enforcement agencies, oral and written reports of conversations and meetings with numerous confidential sources, a review of consensually recorded conversations, and a review of wire intercepted conversations as well as my own personal participation in the investigation which includes surveillance and independent investigation.

9.    I am submitting this affidavit for two reasons: (A) in support of a criminal complaint charging (1) LEONEL ESMENDY GUERRA-PIMENTEL, a.k.a. "Leo," a.k.a. Jose Alfredo Santiago; (2) FERNANDO HERNANDEZ-GONZALEZ, a.k.a. "Nata,"; (3)  CARLOS J. GONZALEZ-ORTIZ, a.k.a. "Marcial," a.k.a. Francisco Diaz ;(4) ANGEL R. VASQUEZ, a.k.a. "Robertico," a.k.a. "Roberto," a.k.a. Milton J. Martinez; (5) ARTURO ROSA, a.k.a. "Victor," a.k.a. "Peje"; (6) LUIS MANUEL GONZALEZ-CALDERON, a.k.a. "Gordo," a.k.a. Rafael Jimenez; (7) MANUEL FLORENTINO, a.k.a. "Lilo"; and (8) WILLIAM MARTINEZ, a.k.a. "Loro," a.k.a. "Lorito"; (hereinafter the "Target Subjects") with conspiracy to distribute five kilograms or more of cocaine, a Scheduled II controlled substance and in violation of Title 21, United States Code, Sections 846, 841(a)(1), and (b)(1)(A)(ii); and (B) in support of an application for the issuance of four (4) Search Warrants to be executed at the Target Locations referred to below and as further described in **Attachments A through D**.

10.    This affidavit includes a summary of events that I am personally familiar with as well as the observations and knowledge related to me by other DEA agents, troopers from the Massachusetts State Police, Boston Police Department Officers and Detectives and other law enforcement personnel who have been working on this investigation. This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that the Target Subjects have committed the above described controlled substance violations, and that the aforementioned four (4) locations contain evidence, proceeds, and contraband relating to the possession, distribution, and trafficking of ~~McLeod~~ COCAINE and other evidence tending to prove that the aforementioned target subjects have violated 21 U.S.C. §846.

4

2.    **Overview of Case**

11.    Beginning in approximately August 2004, the DEA in Boston, MA and the Massachusetts State Police ("MSP") began an investigation into the drug trafficking activities of LEONEL GUERRA-PIMENTEL, a.k.a. Jose Alfredo Santiago, a.k.a. "Leo" (GUERRA). I and other law enforcement agents analyzed telephone toll records related to seizures of cocaine in Ohio and Texas. Based on these records, I believed that these seizures of cocaine were connected to telephones being utilized by GUERRA. Beginning in early November 2004, DEA and other law enforcement agents conducted extensive surveillance of GUERRA, ANGEL VASQUEZ, a.k.a. "Robertico," and other individuals associated with GUERRA in and around the Boston, MA area.

12.    On February 17, 2005, the Honorable Nancy Gertner, U.S. District Court Judge for the District of Massachusetts, signed an order authorizing the interception of wire communications over two telephones: (a) cellular telephone number (617) 224-6074, which is a Nextel cellular telephone, bearing International Mobile Subscriber Identifier ("IMSI") number 316010015606339 and Urban Fleet Mobile Identifier ("UFMI") or "direct-connect" number 180*188084*3 and subscribed to Miosotis Cannon, 1 Horan Way, Apt. 267, in Jamaica Plain, MA ("TARGET TELEPHONE # 1") and; (b) cellular telephone number (857) 222-9364, which is a Pre-Paid T-Mobile cellular telephone bearing IMSI number 310260112114218 and subscribed to "Leo Customer" with no further subscriber information provided ("TARGET TELEPHONE # 2")(hereinafter collectively the "TARGET TELEPHONES"). On March 18, 2005, the Honorable Patti B. Saris (in lieu of Chief Judge Young) signed an order extending the authorization over the TARGET TELEPHONES. The interception of wire communications over TARGET TELEPHONE #2 are ongoing. TARGET TELEPHONE #1 is no longer in use.

13.    In the paragraphs below, I have set forth a summary of a number of the relevant intercepted telephone calls over the TARGET TELEPHONES. I have not detailed herein all of the relevant telephone calls. I also have included parenthetical comments relating to the conversations which contain my own and other law enforcement agents' interpretation of the coded language being

used by the Target Subjects. These interpretations are based on my own experience investigating narcotics traffickers and my familiarity with the facts gathered thus far during this investigation. In addition to the intercepted phone calls, I have included information about the physical surveillance law enforcement agents have conducted of the Target Subjects in conjunction with wire interceptions and seizures of cocaine that took place during the interception of wire communications.

## B.    PROBABLE CAUSE AS TO TARGET SUBJECTS

1.    **LEONEL ESMENDY GUERRA-PIMENTEL, a.k.a. "Leo," a.k.a. Jose Alfredo Santiago ("GUERRA")**

14.    GUERRA is the user of the TARGET TELEPHONES and is believed to be a the leader of a cocaine distribution group operating in the Boston, MA area. Agents believe that GUERRA was referred or addressed by others during the course of Title III wire interceptions as "Leo." GUERRA was identified following his arrest in Warwick, Rhode Island. On May 6, 2002, police officers in Warwick, Rhode Island arrested GUERRA, a.k.a. "Leo" in a parking lot with approximately 583 grams of crack cocaine inside the vehicle he was driving. At the time of the arrest, police officers initially identified GUERRA through his MA driver's license as Jose Alfredo Santiago. On July 17, 2002, GUERRA was charged in a criminal complaint with possession with intent to distribute crack cocaine in federal court in Providence, RI. These charges were later dismissed on August 14, 2002 on the government's motion. Upon dismissal, GUERRA admitted to INS agents that his true name was LEONEL GUERRA-PIMENTEL. GUERRA also told INS agents that he lived at 1 Horan Way, #267, in Jamaica Plain, MA. Significantly, this is the same address as the subscriber address for TARGET TELEPHONE #1.

15.    Before the interception of wire communications, I and other law enforcement agents conducted physical surveillance of GUERRA. On December 6, 2004, at around 1:41 p.m., law enforcement agents observed GUERRA and a Hispanic male identified as ANGEL VASQUEZ, a.k.a. "Robertico" walk out the rear door of the apartment building located at 14 Heron Street in West Roxbury, MA. According to a confidential informant, GUERRA was

6

utilizing 14 Heron Street in West Roxbury as a "stash" location for money and drugs.[1] Agents identified both GUERRA and VASQUEZ through photographs obtained through the MA Registry of Motor Vehicles. Agents followed GUERRA (who was driving a tan Ford Taurus) to 1216 VFW Parkway at around 2:25 p.m. and observed GUERRA meet with three Hispanic males behind building 1216 in the parking lot. During this meeting, agents observed one of these Hispanic males throw a brown cardboard box into the trash dumpster. Once GUERRA and the other individuals left the area, agents retrieved the brown cardboard box from the dumpster. Inside the box, agents found several red plastic wrappings that were consistent with the type of packaging typically used to package kilograms of cocaine. A MSP canine trained in the detection of narcotic odor positively alerted to the presence of narcotic drugs on the plastic wrappings.

### a.  GUERRA Directs HERNANDEZ, VASQUEZ, GONZALEZ-ORTIZ and Others in the Distribution of Cocaine

16.    Following the initiation of wire interceptions, GUERRA was intercepted on a daily basis directing his associates (who are each further described below) in the distribution of drugs and the collection of drug proceeds. For example, on February 18, 2005, at 8:25 p.m., GUERRA received an incoming call from "Nata" (who is believed to be FERNANDO HERNANDEZ-GONZALEZ). "Nata" told GUERRA he only had "a half" left (believed to be half kilogram of cocaine) and "Robertico" (who is believed to be ANGEL VASQUEZ) wanted "three" (believed to be three ounces of cocaine). "Nata" told GUERRA that he had given "four" (ounces of cocaine) to "Marcial" (believed to be GONZALEZ-ORTIZ). "Leo" then told "Nata" to go to "the house" (believed to be a stash location) and see what was left. Nata said he already gave "Peje" (believed be ARTURO ROSA, a.k.a. "Victor") his stuff (cocaine).

17.    On February 22, 2005, at 3:51 p.m., GUERRA received an incoming from

---

[1]This confidential informant is further described in my affidavit in support of the interception of wire communications dated February 17, 2005 and is identified as CS-2. This informant, CS-2, has been cooperating with law enforcement for approximately one year. CS-2 has been cooperating in return for periodic payments from law enforcement and has no known prior convictions.

"Marcial" (GONZALEZ-ORTIZ). During the intercepted conversation, GUERRA asked GONZALEZ-ORTIZ how much money he needed (for cocaine). GONZALEZ-ORTIZ responded by saying that he has the "800," two of the guy's, "2000" and some. GONZALEZ-ORTIZ said that he already sold half (a kilogram), the one that he told GUERRA that he had there. GONZALEZ-ORTIZ then said that "Marco" told him that he had a good price, at 1 and a half ($21,500 per kilogram of cocaine). GUERRA said that he (GUERRA) would get (the cocaine) at an even lower price. GUERRA asked GONZALEZ-ORTIZ how much he owed GUERRA. GONZALEZ-ORTIZ replied "16 and a half or 17" (thousand dollars). GONZALEZ-ORTIZ said that he would give GUERRA "12" (thousand dollars).

18.    On March 1, 2005, at 2:30 p.m., GUERRA received a call from "Robertico" (who is believed to be ANGEL VASQUEZ). During the intercepted call, GUERRA told VASQUEZ that he was there (at the stash location) because they were putting up his curtains (which I believe is code for cutting drugs). VASQUEZ complained that he had some people (customers) waiting. Moments later, VASQUEZ again said that some people were waiting for him at 3:00 p.m. and there was nothing (no drugs available). VASQUEZ said that he had to go pick up "some of the things (drugs) that are prepared" at Nata's (HERNANDEZ's location).

### a.    GUERRA, HERNANDEZ, and GONZALEZ-ORTIZ Deliver Cocaine to "Bourica" on March 7, 2005

19.    On March 7, 2005, at 7:29 p.m., GUERRA called "Nata" (HERNANDEZ). HERNANDEZ said that he was almost finished (preparing the drugs) and that he got "22" out of it. GUERRA told "Nata" (HERNANDEZ) to do what he can (referring to cutting the cocaine to get as much cocaine to sell as possible). GUERRA then told "Nata" (HERNANDEZ) to take out "4" (ounces of cocaine) of "1" (kilogram of cocaine) and give it to "Marcial" (GONZALEZ-ORTIZ). GUERRA told "Nata" (HERNANDEZ) to have "Marcial" (GONZALEZ-ORTIZ) put the "4" (ounces of cocaine) in his (Marcial's) car. GUERRA then told "Nata" (HERNANDEZ) to take out "10" (ounces) and put "4" (ounces) aside in a bag for "Marcial" (GONZALEZ-ORTIZ) to have around there so that he (GUERRA) and "Marcial"

8

(GONZALEZ-ORTIZ) can take it (the 4 ounces of cocaine) to "Boricua," (slang for a Puerto Rican male) who would call him (GUERRA).

20.    At approximately 8:18 p.m., members of the Boston Police Department (BPD), Drug Control Unit who were conducting surveillance outside 50 Pinehurst Street in Roslindale, observed GONZALEZ-ORTIZ, a.k.a. "Marcial" walk out of the front door 50 Pinehurst Street, get into a Toyota Camry with MA Registration 38T-H33, and drive around the block. BPD officers positively identified GONZALEZ-ORTIZ through a MA RMV photograph. After driving around the block, BPD officers followed GONZALEZ-ORTIZ in the Toyota Camry to the area of area of Humboldt Avenue and Crawford Street in Roxbury, MA. There, BPD officers observed an Hispanic male (who is believed to be "Boricua) approach GONZALEZ-ORTIZ's Toyota Camry for a short period, engage in brief conversation with GONZALEZ-ORTIZ after which GONZALEZ-ORTIZ drove off. The Hispanic male ("Boricua") then walked to a brown Nissan Sentra occupied by two Caucasian males, later identified as Carl Giannelli and David Hanley. Around the same time, an undercover BPD officer walked by the brown Nissan and observed the male driver (Hanley) pass a tin foil package to the rear seat passenger. A short time later, the Hispanic male (believed to be "Boricua") got out of the Nissan. The two males occupants drove away in the Nissan.

21.    Based on these observations, BPD officers conducted a traffic stop of the Nissan. During the stop of the vehicle, BPD officers spoke with the driver of the vehicle and identified him as David Hanley through his driver's license. After confronting Hanley about the drug transaction officers believed they had witnessed, Hanely voluntarily produced a large plastic bag containing tin foil and cinnamon. Inside the bag, officers found a white powdery substance that field tested positive for cocaine. BPD officers then detained Giannelli and Hanley and officers seized a total of more than 100 grams of cocaine contained in tin foil and cinnamon.

22.    At 8:53 p.m., "Marcial" (GONZALEZ-ORTIZ) called GUERRA and told him that he had taken care of (given cocaine to) "Boricua" and that he ("Boricua") already left.

9

"Marcial" (GONZALEZ-ORTIZ) added that "Boricua" gave him (GONZALEZ-ORTIZ) "34"
($3,400 for four ounces of cocaine at $850 for each ounce).

> **b.** **March 18, 2005 Seizure of Six Kilograms of Cocaine Involving GUERRA, HERNANDEZ, GONZALEZ-ORTIZ, and GONZALEZ-CALDERON**

23.    On March 18, 2005, at 12:20 p.m.,"Leo" (GUERRA) called "Marcial"
(GONZALEZ-ORTIZ). During the intercepted call, "Marcial" said that "El Gordo" left and that
he (GONZALEZ-ORTIZ) gave "El Gordo" "25" ($25,000). GUERRA asked
GONZALEZ-ORTIZ why he (GONZALEZ-ORTIZ) did not get "something" (some cocaine) if
he (GONZALEZ-ORTIZ) gave him (El Gordo) "40"($40,000). "Marcial" said that "El Gordo"
was in a rush and that he (GONZALEZ-ORTIZ) told "El Gordo" that he (GONZALEZ-ORTIZ)
had to get another one. "Marcial" said that he ("El Gordo" ) told him (GONZALEZ-ORTIZ) to
just give him ("El Gordo") that. "Marcial" further stated that "El Gordo" said that he had to
leave because he ("El Gordo") had to organize "the things." GUERRA then told "Marcial"
(GONZALEZ-ORTIZ) to call "El Gordo" and tell him that he (GONZALEZ-ORTIZ) needs to
know for sure if he ("El Gordo") is coming today. "Marcial" (GONZALEZ-ORTIZ) said that
was the reason he ("El Gordo") left because he ("El Gordo") would be here today for sure. At
12:32 p.m., "Marcial" (GONZALEZ-ORTIZ) called "Leo" (GUERRA) back and told him
(GUERRA) that he had just spoken to "El Gordo" and said that he ("El Gordo") would be "here"
at around 3:30 (to deliver the cocaine).

24.    The same day, March 18, 2005, at 12:47 p.m., "Robertico" (VASQUEZ) called
"Leo" (GUERRA). During the intercepted call, "Leo" asked "Robertico" (VASQUEZ) if he still
had "4" ($4,000) that he (VASQUEZ) had mentioned earlier. "Robertico" said that he had "2"
($2,000). GUERRA then instructed "Robertico" (VASQUEZ) to lend him the 2 because he
(GUERRA) is waiting for something at 3:30 (referring to the drug deal with "El Gordo" at 3:30).
During an intercepted call at 3:30 p.m., "Robertico" (VASQUEZ) asked GUERRA if the
"garbage" (money) and a half that he (GUERRA) told him about will go through (referring to the

drug deal with "El Gordo"). GUERRA affirmed and said that he was waiting (for "El Gordo" now). "Robertico" (VASQUEZ) asked "Leo" (GUERRA) to get one (1 kilogram of cocaine) for him and GUERRA agreed.

25.    The same day, March 18, 2005, at about 3:25 p.m., law enforcement agents established surveillance in the area of 50 Pinehurst Street in Roslindale, MA.  At 3:54 p.m., "Nata" (HERNANDEZ) called GUERRA and told GUERRA that "Amauri" wanted "2 things" (two kilograms of cocaine).  GUERRA said that he was on his way to see "Gordo" and that it would be in an hour.  During an intercepted call at 4:11 p.m., "Nata" (HERNANDEZ) asked GUERRA if he had already met with "that guy" (referring to "El Gordo").  GUERRA said that he was about to leave to go over there (to 50 Pinehurst Street) to receive it (the cocaine) and that he just came to the house to get some money.

26.    The same day, March 18, 2005, at approximately 4:30 p.m. Officer Walsh observed a black Toyota Camry with MA registration 38T-H33 arrive and park on Haslett Street. Officer Walsh observed GONZALEZ-ORTIZ, a.k.a. "Marcial" and GUERRA exit the black Toyota Camry and enter 50 Pinehurst Street.  About fifteen minutes later, Officer Walsh observed a Honda Odyssey arrive and park on Haslet Street near 50 Pinehurst Street.  Officer Walsh observed an Hispanic male believed to be "El Gordo" (later identified as LUIS MANUEL GONZALEZ-CALDERON) get out of the Honda Odyssey and enter 50 Pinehurst Street.  Officer Walsh saw GONZALEZ-CALDERON carrying a weighted black backpack on his left shoulder. Five minutes later, Officer Walsh saw "El Gordo" (GONZALEZ-CALDERON) exit 50 Pinehurst Street carrying the same black backpack over the same shoulder and return to the Honda Odyssey.  Officer Walsh observed that the black backpack appeared to be less weighted than just minutes before when the Hispanic male ("El Gordo," GONZALEZ-CALDERON) first entered the apartment.  The Hispanic male (GONZALEZ-CALDERON) then got back into the Honda Odyssey and departed the area.

27.    The same day, March 18, 2005, at approximately 5:50 p.m., Officer Walsh saw a

11

gray Chevrolet Impala park across the Street from 50 Pinehurst Street. At the same time, Officer

Walsh observed ANGEL VASQUEZ, a.k.a. "Robertico," walk from Haslet Street onto Pinehurst

Street and motion towards the Chevrolet Impala with his hand and one finger raised (believed to

indicate 'one minute') and then enter 50 Pinehurst Street. A short time later, Officer Walsh saw

VASQUEZ exit 50 Pinehurst Street and proceed over to the Chevrolet Impala and enter it.

VASQUEZ remained in the car for about a minute and then returned to 50 Pinehurst Street while

the Chevrolet Impala left the area. At approximately 6:00 p.m., Officer Walsh saw the Hispanic

male from the Honda Odyssey (GONZALEZ-CALDERON) walk down Haslet Street, turn onto

Pinehurst Street carrying a large multi-colored weighted shopping bag and enter 50 Pinehurst

Street. Around ten minutes later, at about 6:10 p.m., Officer Walsh observed the same Hispanic

male (GONZALEZ-CALDERON) exit 50 Pinehurst Street carrying a weighted large white

weighted shopping bag (which appeared to be over the multi-colored bag) and walk down Haslet

Street toward Roslindale Avenue. Officer Reid observed GONZALEZ-CALDERON get into an

unoccupied Honda Accord on Haslet Street carrying the shopping bag. TFA O'Neil observed

GONZALEZ-CALDERON in the driver's seat talking on a cellular telephone as the car backed

up on Roslindale Avenue and proceeded onto Washington Street.

28.    Minutes later on the same day, March 18, 2005, at approximately 6:20 p.m., TFA

O'Neil and other officers approached the Honda Accord to interview GONZALEZ-CALDERON

as he departed from the car in an attempt to identify him. Officer Walsh observed the white bag,

that was seen earlier being carried by GONZALEZ-CALDERON and the multi-colored bag (also

seen earlier) on the front passenger floor of the car as Officer Walsh was standing outside of the

car. Through the car's side window, Officer Walsh could see a square package wrapped in gray

duct tape. The package was inside an open white plastic bag. Officer Walsh recognized the

package, based upon his training and experience to be consistent with a kilogram package of

cocaine. Officer Walsh then opened the car's door and retrieved the white bag from the

passenger side floor. Six similar packages were recovered from the white plastic bag each

12

containing a kilogram package consistent with cocaine, for a total of six kilograms. The substance in each of the six packages was later field tested and the results were positive for cocaine. Agents placed the Hispanic male, "El Gordo," under arrest. As further described below, "El Gordo" was later identified as LUIS MANUEL CALDERON-GONZALEZ.

29.     During an intercepted call on the next day, March 19, 2005, at 2:44 p.m. "Marcial" (GONZALEZ-ORTIZ) told "Leo" (GUERRA) that he had just learned that "Gordo" (GONZALEZ-CALDERON) got busted last night.  "Leo" (GUERRA) asked "Marcial" (GONZALEZ-ORTIZ) how it happened. "Marcial" (GONZALEZ-ORTIZ) said he did not know. GUERRA asked GONZALEZ-ORTIZ  what time did he ("El Gordo") leave from over there. GUERRA said he ("El Gordo") left at around 6:00 something in the afternoon. "Marcial" asked if Sandro's area was West Roxbury, and GUERRA said no, it was in Roslindale (in the area of 50 Pinehurst Street in Roslindale).

## 2.     FERNANDO HERNANDEZ-GONZALEZ, a.k.a. "Nata," ("HERNANDEZ")

30.     Agents believe that FERNANDO HERNANDEZ-GONZALEZ is a Dominican male who was referred to or addressed by others as "Nata" during Title III interceptions. HERNANDEZ was intercepted speaking with GUERRA from cellular telephone number (617) 319-1281, subscribed to Priscilla James, 23 Colberg Ave., W. Roxbury, MA; and telephone number 617-590-6682, a number provided to National Grid Corporate Security Department for the utilities for 175 Centre Street, Apt. 1115, Quincy, MA, which are in the name of FERNANDO HERNANDEZ. During physical surveillance conducted during the period of wire interceptions, law enforcement agents have identified "Nata" as HERNANDEZ through his MA driver's license photograph. On numerous occasions, agents have also observed HERNANDEZ driving a blue Audi, with ~~MA registration~~ MA registration 92K-H31, which is registered to FERNANDO HERNANDEZ until February 27, 2005.[2] HERNANDEZ is believed to be a

---

[2]According to MA RMV records, on February 27, 2005, this vehicle was re-registered in the name of Noma Rivera, which is believed to be used by Hayde Baez, GUERRA's wife.

runner/worker for GUERRA who delivers cocaine and collects drug proceeds for GUERRA.

31.     During an intercepted call on February 19, 2005, at 1:36 p.m., GUERRA asked "Nata" (HERNANDEZ) what he was doing. "Nata" responded that he was at Tremont (Avenue) going to get the car (believed to be a blue Audi) washed. GUERRA then told "Nata" to take it (the car) over to the black guy's car wash on Geneva (Avenue). Based on this phone call, BPD Sgt. Det. Duggan established surveillance at A.C. Car Wash located on Geneva Avenue in Dorchester, MA. At approximately 2:00 p.m., Sgt. Det. Duggan observed an Hispanic male driving a blue Audi with MA registration 92K-H31, at A.C. Car Wash getting the blue Audi washed at the car wash. During this surveillance, Seg. Det. Duggan positively identified this Hispanic male as FERNANDO HERNANDEZ-GONZALEZ through a MA RMV photograph.

32.     The same day, February 19, 2005, at 2:19 p.m., a Hispanic male calling himself "Jason" called GUERRA. "Jason" asked "Leo" (GUERRA) to stop by his house. GUERRA asked if he should send "Nata" over and "Jason" responded yes. "Jason" told "Leo" (GUERRA) that they are at "5 ½," (ounces of cocaine) including the "one" for today. "Leo" (GUERRA) asked "Jason" if he gave him (believed to be "Nata," HERNANDEZ) money yesterday. "Jason" replies that for "one and a half" (money for one and a half ounces of cocaine); for what "Marcial" (GONZALEZ-ORTIZ) gave him this week; the half and the whole one. Later in the call, GUERRA asked Jason if "Robertico" (VASQUEZ) delivered "one" (ounces of cocaine) to him yesterday. Jason affirmed. GUERRA then told Jason that "four and one half" plus "one half" delivered to him comes out to "five," plus one delivered to him the day before yesterday with Robertico comes to "six" and plus one that "Nata" delivered to him comes to "seven," minus one and a half, comes to five and one half (meaning that Jason owes GUERRA money for five and a half ounces of cocaine). At the end of the call, GUERRA asked "Jason" if was there (at his residence). "Jason" responded that he would be there in five minutes.

33.     The same day, February 19, 2005, at 2:45 p.m., GUERRA called to "Nata" (HERNANDEZ) and told "Nata" to go to the "hole" (a stash location) and weigh out 51.3

14

(grams) with the packaging. "Nata" (HERNANDEZ) said that he had seven (ounces) left in the car. Leo told "Nata" to bring "six" (ounces) plus the "fifty" (grams) to "Cesar" and then deliver to "Jason." "Nata" agreed. At around 2:55 p.m., Dets. Walsh and Duggan followed HERNANDEZ, who was driving the blue Audi, from the A.C. Carwash in Dorchester to 14 Heron Street in West Roxbury where HERNANDEZ arrived at around 3:15 p.m. HERNANDEZ got out of the blue Audi and entered 14 Heron Street. A short time later at around 3:25 p.m., Dets. Walsh and Duggan saw HERNANDEZ walk out of the 14 Heron and get back into the blue Audi. Dets. Walsh and Duggan followed HERNANDEZ from 14 Heron Street to the rear parking lot of 6 Kenelworth Street in Roxbury where HERNANDEZ arrived at around 3:50 p.m. Detectives observed HERNANDEZ get out of the blue Audi and enter the building at 6 Kenelworth Street. Ten minutes later, at around 4:00 p.m., Dets. Walsh and Duggan observed HERNANDEZ exit the building.

34.     As further described above in paragraphs 19-22, during an intercepted call on March 7, 2005, at 7:29 p.m., GUERRA directed "Nata" (GUERRA) to give four ounces of cocaine to GONZALEZ-ORTIZ, a.k.a. "Marcial" in order for DIAZ to give that cocaine to "Bourica." Following this intercepted phone call, at around 8:18 p.m., BPD officers observed DIAZ meet with an Hispanic male who is believed to be "Bourica." "Bourica" then met with two Caucasian who where then stopped by the BPD and found to be in the possession of approximately four ounces of cocaine.

## 3.     CARLOS J. GONZALEZ-ORTIZ, a.k.a. "Marcial," a.k.a. Francisco Diaz ("GONZALEZ-ORTIZ")

35.     Agents believe that GONZALEZ-ORTIZ is a Dominican male who was referred to or addressed by others as "Marcial" during Title III interceptions. GONZALEZ-ORTIZ was intercepted speaking with GUERRA from cellular telephone number 617-438-3697, subscribed to Nehemias Perez, 42 Sunnyside Street, Apt. 2, Hyde Park, MA; and 617-839-1579, subscribed to, Nehemias Perez, 42 Sunnyside Street, Apt. 2, Hyde Park, MA. During physical surveillance conducted during the period of wire interceptions, law enforcement agents have identified

"Marcial" as GONZALEZ-ORTIZ through his MA driver's license photograph. Furthermore, during surveillance, law enforcement agents have observed GONZALEZ-ORTIZ driving a Toyota Camry registered to CARLOS J. GONZALEZ-ORTIZ. As further described below, the utilities to GUERRA's primary stash location, 600 Matthew Court in Braintree, MA, are in the name of CARLOS GONZALEZ. GONZALEZ-ORTIZ is believed to be an associate of GUERRA in the distribution of cocaine.

36.    As further described above in paragraphs 19-22 and 34, during an intercepted call on March 7, 2005, at 7:29 p.m., GUERRA directed "Nata" (GUERRA) to give four ounces of cocaine to GONZALEZ-ORTIZ, a.k.a. "Marcial" in order for DIAZ to give that cocaine to "Bourica." Following this intercepted phone call, at around 8:18 p.m., BPD officers observed DIAZ meet with an Hispanic male who is believed to be "Bourica." "Bourica" then met with two Caucasian who where then stopped by the BPD and found to be in the possession of approximately four ounces of cocaine. During an intercepted phone call the same day, March 7, 2005, at 8:53 p.m., "Marcial" (GONZALEZ-ORTIZ) called GUERRA and told him that he had taken care of (given cocaine to) "Boricua" and that he ("Boricua") already left. "Marcial" (GONZALEZ-ORTIZ) added that "Boricua" gave him (GONZALEZ-ORTIZ) "34" ($3,400 for four ounces of cocaine at $850 for each ounce).

37.    As further described above in paragraphs 23-29, during a series of intercepted calls on March 18, 2005, GUERRA discussed with "Marcial" (GONZALEZ-ORTIZ) a delivery of cocaine from a Hispanic male referred to as "El Gordo" in the area of 50 Pinehurst Street in Roslindale, MA. The meeting was first arranged for 3:30 p.m., but then was delayed to around 4:30 p.m. At approximately 4:30 p.m., Officer Walsh observed GONZALEZ-ORTIZ, a.k.a. "Marcial" and GUERRA arrive in a black Toyota Camry, park, and enter 50 Pinehurst Street in Roslindale. About fifteen minutes later, Officer Walsh observed GONZALEZ-CALDERON, a.k.a. "El Gordo" arrive in a Honda Odyssey arrive and park on Haslet Street near 50 Pinehurst Street. Officer Walsh observed an Hispanic male believed to be "El Gordo" (later identified as

16

LUIS MANUEL GONZALEZ-CALDERON) get out of the Honda Odyssey and enter 50

Pinehurst Street. Around ten minutes later, at about 6:10 p.m., Officer Walsh observed

GONZALEZ-CALDERON exit 50 Pinehurst Street carrying a weighted large white paper bag

and walk down Haslet Street get into a Honda Accord. At around 6:20 p.m., TFA O'Neil and

other law enforcement agents approached GONZALEZ-CALDERON and observed on the front

passenger floor a square package wrapped in gray duct tape inside the white paper bag. As

further described above, agents searched the bag and seized approximately six kilograms of

cocaine. During an intercepted call the next day, on March 19, 2005, at 2:44 p.m. "Marcial"

(GONZALEZ-ORTIZ) told "Leo" (GUERRA) that he had just learned that "Gordo"

(GONZALEZ-CALDERON) got busted last night in Roslindale."

### 4.    ANGEL R. VASQUEZ, a.k.a. "Robertico," a.k.a. "Roberto," a.k.a. Milton J. Martinez ("VASQUEZ")

38.    Agents believe that ANGEL VASQUEZ is a Dominican male who was referred to

or addressed by others as "Robertico" during Title III interceptions. VASQUEZ was intercepted

speaking with GUERRA from cellular telephone number 617-938-4946, subscribed to Jose

Roberto Guerrero, 2 Maple Ct., Apt. 4, Dorchester, MA. VASQUEZ is believed to be an

associate of GUERRA in the distribution of cocaine.

39.    As further described above in paragraphs 23-29 and 37, during a series of

intercepted calls on March 18, 2005, GUERRA discussed with "Marcial" (GONZALEZ-ORTIZ)

a delivery of cocaine from "El Gordo" (GONZALEZ-CALDERON) in the area of 50 Pinehurst

Street in Roslindale, MA. During an intercepted call the same day, March 18, 2005, at 12:47

p.m., "Leo" (GUERRA) asked "Robertico" (VASQUEZ) to lend him (GUERRA) some money

in order to obtain something (cocaine) from "El Gordo" (GONZALEZ-CALDERON). Next,

during an intercepted call at 3:30 p.m., "Robertico" (VASQUEZ) asked "Leo" (GUERRA) to get

"one" (1 kilogram of cocaine) for him and GUERRA agreed. During an intercepted conversation

at 4:23 p.m., "Robertico" (VASQUEZ) asked "Leo" (GUERRA) if "it" would be done (referring

to the drug deal with "Gordo") and GUERRA affirmed. "Leo" (GUERRA) said that he was

17

already heading over there and that they were waiting for him to get "that" (cocaine). "Robertico" (VASQUEZ) asked "Leo" if he would do "it" (the drug transaction) at his (GUERRA's) place or "Marcial's" (GONZALEZ-ORTIZ). "Leo" (GUERRA) said that it would be over at "Marcial's," but that he would send "Nata" (HERNANDEZ) to go get "it" (the cocaine). As further described above, at approximately 6:20 p.m., law enforcement agents approached GONZAZLEZ-CALDERON, a.k.a. "Gordo" and seized approximately six kilograms of cocaine out of his vehicle.

40. On March 30, 2005, law enforcement agents conducted surveillance of GUERRA, VASQUEZ, and HERNANDEZ at 600 Matthew Court in Braintree, MA. During an intercepted call at 11:14 a.m., GUERRA called "Robertico" (VASQUEZ) and asked "Leo" (GUERRA) where he was. GUERRA responded that he was at home and had "Nata's" (HERNANDEZ's) car. During an intercepted call at 11:28 p.m., GUERRA told "Robertico" (VASQUEZ) to come over fast. At 11:44 a.m., GUERRA called "Robertico" (VASQUEZ). During this call, "Robertico" said that he (VASQUEZ) was almost there. GUERRA told "Robertico" (VASQUEZ) to hurry because "those women" are coming over. At 11:54 a.m., GUERRA called "Nata" (HERNANDEZ) and told him (HERNANDEZ) that he (GUERRA) would call him (HERNANDEZ) for him to come over to the "cave." At 12:04 p.m., GUERRA called "Nata" (HERNANDEZ) again and told "Nata" (HERNANDEZ) that they (GUERRA and VASQUEZ) were on their way there (to the "cave," stash location).

41. At approximately 12:25 p.m., DEA SA Hersey saw HERNANDEZ arrive in parking lot behind Building No. 600 of the *Liberty Woods'* apartments (600 Matthew Court) driving the same blue Audi observed by law enforcement on prior occasions. SA Hersey observed HERNANDEZ enter Building 600 several times carrying in bottles of water and papers towels in a box from the blue Audi. (Based on my training and experience, I believe that the water and paper towels were used to prepare cocaine from re-sale). At around 1:07 p.m., SA Hersey observed GUERRA, a.k.a. "Leo" and VASQUEZ, a.k.a. "Robertico," arrive in a

grey/silver Honda Accord bearing MA registration 59T-T49, in the same parking lot and enter Building 600. At approximately 2:46 p.m., SA Hersey observed both VASQUEZ and HERNANDEZ walk out of Building 600 carrying white plastic bags, get into HERNANDEZ' blue Audi with the plastic bags, and depart the area. Shortly thereafter, SA Hersey saw GUERRA walk out of Building 600 carrying two black plastic bags. SA Hersey observed GUERRA get into the same grey/silver Honda Accord with the black plastic bags and depart the area.

5.    **ARTURO ROSA, a.k.a. "Victor," a.k.a. "Peje," ("ROSA")**

42.    Agents believe that ARTURO ROSA is a Dominican male who was referred to or addressed by others as "Victor" and/or "Peje" during Title III interceptions. ROSA was intercepted speaking with GUERRA from telephone number (617) 524-0715, subscribed to Vimar Designs, D.B.A. Victor Martinez (which is tailor shop located at 3205 Washington Street in Jamaica Plain); and telephone number (617) 828-1738, which is subscribed to ARTURO ROSA, 206 Warren Street Apt. 1, Roxbury, MA. During the period of wire interceptions, law enforcement agents conducting surveillance have observed ROSA entering and leaving the Vimar Designs business. ROSA was identified through a MA RMV photograph in the name ARTURO ROSA. ROSA is believed to be GUERRA's father-in-law who regularly obtains cocaine from GUERRA for re-distribution.

43.    Based on wire interceptions, GUERRA is believed to have sent money to the Dominican Republic through using a money remitter service at Vimar Design. For example, during an intercepted call on February 24, 2005, at 6:52 p.m., GUERRA called Vimar Designs and asked for *"Viejito"* (little old man) and spoke with "Victor" (who is believed to be ARTURO ROSA). GUERRA asked "Victor" (ROSA) to send $1,500 for him "over there" (in the Dominican Republic) and added that he would come by in a hour to give him the money. "Victor" (ROSA) then gave the phone to unidentified female and GUERRA gave the female the name and address of an individual in the Dominican Republic.

19

44.    During an intercepted call on March 19, 2005, at 4:53 p.m., GUERRA received an incoming call from "Victor," a.k.a. "Peje." (ROSA) told "Leo" (GUERRA) that he wanted to talk business.    During a more than seven minute conversation, "Victor" explained to "Leo" that he wanted him (GUERRA) to provide ROSA with kilogram quantities of cocaine instead of just ounces because it was getting too expensive. Both Victor and Leo discussed the calculations for the price of a kilogram of cocaine and the profit margin that GUERRA had been receiving from selling cocaine.

45.    During an intercepted call on March 28, 2005, at 11:18 a.m., GUERRA told "Nata" (HERNANDEZ) to put the "pretty stuff" (good quality drugs) for the one that he (HERNANDEZ) was going to see in Boston.  "Nata" (HERNANDEZ) then asked "Leo" (GUERRA) who was in line.  GUERRA said it was "Flaco."  "Nata" (HERNANDEZ) said he already spoke with him ("Flaco").  "Nata" (HERNANDEZ) said that he would see then "Peje" (ARTURO ROSA, a.k.a. "Victor").  GUERRA instructed "Nata"  to go see "Peje" (ROSA) first. At 12:20 p.m., "Nata" (HERNANDEZ) called "Leo" (GUERRA) and asked "Leo" for the apartment number for "Peje" (ROSA, a.k.a. "Victor").  GUERRA replied, "706."

46.    The same day, March 28, 2005, at approximately 12:22 p.m., DEA SA Hersey observed HERNANDEZ arrive at the *Lincoln Heights* apartment complex in Quincy, MA driving the blue Audi and park in front of Building No. 6. SA Hersey observed HERNANDEZ walk up to the front door of Building No. 7, push the intercom entry button, and enter shortly thereafter. At around 12:27 p.m., SA Hersey saw HERNANDEZ walk out of Building No. 7 and observed HERNANDEZ talking on a cell phone. Thereafter, HERNANDEZ got back into the blue Audi. SA Hersey followed HERNANDEZ to the area of Hyde Park, MA. Later that evening, at around 7:45 p.m., SA Hersey returned to the *Lincoln Heights* apartment complex and saw two vehicles, a green Plymouth Breeze, and black Ford Escape, parked in front of Building No. 7, both of which were registered to ARTURO ROSA.

**6.    LUIS MANUEL GONZALEZ-CALDERON, a.k.a. "Gordo," a.k.a. Rafael Jimnez (GONZALEZ-CALDERON)**

20

47.    Agents believe that LUIS MANUEL GONZALEZ-CALDERON is a Dominican male who was referred to others as "Gordo" during Title III interceptions. During the wire interceptions, there were multiple intercepted conversations between GUERRA and "Marcial" (GONZALEZ-ORTIZ) where "Marcial" indicated that he had spoken with "Gordo" about obtaining kilogram quantities of cocaine from "Gordo." As further described above in paragraphs 23-29, GONZALEZ-CALDERON was arrested on March 18, 2005 in Roslindale following the seizure of six kilograms of cocaine from the vehicle he was operating. Furthermore, during an intercepted call on the next day, March 19, 2005, at 2:44 p.m. "Marcial" (GONZALEZ-ORTIZ) told "Leo" (GUERRA) that he had just learned that "Gordo" (GONZALEZ-CALDERON) got busted last night in Roslindale.

**7.    MANUEL A. FLORENTINO, a.k.a "Lilo" ("FLORENTINO")**

48.    Agents believe that MANUEL A. FLORENTINO is a Dominican male who was referred to or addressed by others as "Lilo" during Title III interceptions. FLORENTINO was intercepted speaking with GUERRA from telephone number 617-959-5974, unknown subscriber. Based on intercepted wire communications and surveillance, agents believe that FLORENTINO is a supplier of cocaine to GUERRA.

49.    During an intercepted call on March 26, 2005, at 10:46 a.m., "Lilo" (FLORENTINO) told "Leo" (GUERRA) that he was on his way. "Lilo" (FLORENTINO) asked "Leo" if they (GUERRA and FLORENTINO) if they would meet in his (GUERRA's) area and "Leo" affirmed. GUERRA and "Lilo" agreed to meet at a certain location. "Leo" (GUERRA) then gave "Lilo" (FLORENTINO) directions and told "Lilo" to call him (GUERRA) when he got to exit 17. At approximately 11:15 a.m., DEA TFA O'Neil established surveillance at Sport Authority Braintree Union Street near Exit 17 of Route 3 in Braintree, MA based on intercepted calls during which "Leo" (GUERRA) he was at this location. During an intercepted call at 11:32 a.m., GUERRA answered an incoming call from "Lilo" (FLORENTINO) during which "Lilo"

21

asked "Leo" if it was where it says "Sport Authority." "Leo" (GUERRA) said yes. "Lilo" (FLORENTINO) then asked "Leo" to walk outside. At around 11:40 a.m., TFA O'Neil saw GUERRA walk out of the Sport's Authority talking on a cell phone, get into the grey/silver Honda Accord and leave the area.

50.     At approximately 12:00 p.m., IRS SA McLeod observed the same grey/silver Honda that TFA O'Neil observed GUERRA driving a short time before parked behind Building 600 (600 Matthew Court) of the *Liberty Woods* condominiums in Braintree. SA McCleod also saw a silver Toyota RAV-4 with MA registration 826-6ZF, registered to Annabell Malaze, 12-B Emerald Court, Boston parked next to the Honda Accord. At approximately 12:09 p.m., SA McLeod observed an Hispanic male (later identified by SA McLeod through an immigration photograph as MANUEL FLORENTINO) carrying a black duffle bag and get into the Toyota RAV-4. Shortly thereafter, SA McLeod saw GUERRA walk toward the same grey/silver Honda in which TFA O'Neil observed GUERRA driving just minutes before. GUERRA and FLORENTINO then departed the apartment complex in their respective vehicles in tandem.

51.     During an intercepted call on March 29, 2005, at 9:16 p.m., GUERRA asked "Lilo" how those "women" were doing. "Lilo" (FLORENTINO) responded that they are at the same place where he (GUERRA) usually picks them up. GUERRA told "Lilo" that he wanted to get "three" more (kilograms of cocaine) from "Lilo." In response, "Lilo" (FLORENTINO) told GUERRA that he had "four" (kilograms of cocaine) but could only give GUERRA "two" (kilograms of cocaine) because he (FLORENTINO) had two other commitments (for the other two kilograms of cocaine). GUERRA then asked "Lilo" to put those two (kilograms) aside for him. GUERRA then told "Lilo" that he (GUERRA) would call him later about a time to meet up with him (FLORENTINO).

52.     During an intercepted call the next day, March 30, 2005, at 5:57 p.m., "Lilo" (FLORENTINO) called "Leo" (GUERRA). GUERRA told "Lilo" that he would call him (FLORENTINO) in an hour because he was getting ready. "Lilo" (FLORENTINO) told

22

GUERRA that he would go pick up the "woman" (cocaine) to have her close by. At 6:16 p.m., GUERRA called "Marcial" (GONZALEZ-ORTIZ) and told him to get the money because he (GUERRA) was going to give this man (believed to be "Lilo," FLORENTINO) who was going to give him (GUERRA) something (cocaine).

53.     During a series of calls the same day, March 30, 2005, GUERRA and "Lilo" (FLORENTINO) arranged to meet in Braintree at the same location they met on March 26, 2005. For example, during an intercepted call at 7:57 p.m., GUERRA told "Lilo" that he (GUERRA) was at the place where they sell stereos and movies (referring to Best Buy). At approximately 8:00 p.m., DEA SA Dorsey observed GUERRA in a the same grey/silver Honda parking in parking lot near Best Buy in Braintree at the same shopping center near Exit 17 to Route 3 in Braintree. During an intercepted call at 8:05 p.m., "Lilo" told GUERRA that he saw him and asked "Leo" if he was in front of that red car to which GUERRA affirmed. At approximately 8:06 p.m., SA Dorsey observed GUERRA driving the grey/silver Honda and the same Toyota RAV-4 observed on March 26, 2005 occupied by two Hispanic males depart the shopping center in tandem. At approximately 8:14 p.m., SA Hersey, who had earlier established surveillance at the *Liberty Woods* apartment complex (600 Matthew Court) in Braintree, MA, observed "Marcial" (GONZALEZ-ORTIZ) and GUERRA walk across the parking lot toward Building 600. Moments later, SA Hersey saw MANUEL FLORENTINO, a.k.a. "Lilo" wearing a brown jacket and another Hispanic male (later identified as WILLIAM MARTINEZ) who was carrying a large black canvas bag on his shoulder (MARTINEZ's) approach Building 600. SA Hersey observed all four individuals walk into Building 600 together. At around 8:31 p.m., SA Hersey observed FLORENTINO and MARTINEZ walk out of Building 600, get into the Toyota RAV-4 and depart the area.

54.     Moments later, on the same day, March 31, 2005, officers from the Braintree Police Department attempted a traffic stop of the Toyota RAV-4. Officer Delpapa activated his emergency lights and sirens to pull over the Toyota RAV-4, but the vehicle sped away in the

23

direction of Weymouth, MA. Following a several minute chase of the Toyota RAV-4, Det. Cohoon of the Braintree PD continued to pursue the RAV-4 down Route 18. Soon thereafter, officers from the Braintree PD and the Abington PD were able to stop this vehicle on Route 18 just beyond the Cape Cod Lumber store. The driver of the vehicle was identified as WILLIAM MARTINEZ, the same individual observed carrying the black bag into Building 600 at 600 Matthew Court. The officers also identified the sole passenger as MANUEL A. FLORENTINO. The officers placed MARTINEZ under arrest for Failing to Stop and Operating a Motor Vehicle on a Suspended License and seized the Toyota RAV-4. After a short period of time, the officers released FLORENTINO.

55. During an intercepted call the same day, March 31, 2005, at 9:34 p.m., "Lilo" (FLORENTINO) called "Leo" (GUERRA) and informed him that "Loro" (MARTINEZ) had been arrested. FLORENTINO said that "Loro" (MARTINEZ) did not have a driver's license. GUERRA asked FLORENTINO what happened and "Lilo" (FLORENTINO) said he had to throw away all that "shit" (cocaine and money). During several subsequent intercepted calls, GUERRA and FLORENTINO arranged for GUERRA to pick up FLORENTINO at a gas station in Abington (since FLORENTINO was without a vehicle). At approximately 10:20 p.m., SA Hersey observed GUERRA arrive at a Mobile gas station located at the intersection of Route 18 and Route 139 in Abington, MA. As GUERRA arrived, SA Hersey saw FLORENTINO get into the grey/silver Honda and depart the area with GUERRA.

## 8. WILLIAM MARTINEZ, a.k.a. "Loro," a.k.a. "Lorito"

56. Agents believe that WILLIAM MARTINEZ is a Dominican male who was referred to by others as "Loro" or "Lorito" during Title III interceptions. As further described above in paragraphs 48-55, on March 30, 2005, SA Hersey observed MARTINEZ entering 600 Matthew Court carrying black bag with GUERRA, FLORENTINO and GONZALEZ-ORTIZ. Based on intercepted conversations, agents believe that FLORENTINO and MARTINEZ were in the process of delivering at least two kilograms of cocaine to GUERRA. Following this

24

observation, officers from the Braintree Police Department and FLORENTNO and MARINTEZ fled in a high speed chase and arrested MARTINEZ. After this arrest, FLOREINTO called GUERRA and told him that "Loro" (MARTINEZ) had been arrested and that he (FLORENTINO) had to ~~through~~ *Throw* all the "shit" (cocaine and money) out the window.

## C. TARGET LOCATIONS

1.    **Liberty Woods, 600 Matthew Court, Apartment No. 103, Braintree, MA 02184**
("Stash" Location)

### A.    Description of Premises (Attachment A)

57.    *Liberty Woods* is a series of two and three level apartment buildings located approximately a half mile from the intersection of Liberty Street and Grove Street in Braintree, MA. Apartment number 103 is located on the first floor of Building 600. Building 600 is a two story structure at the entrance which flows into a three story structure. Building 600 has aluminum siding off-white in color with slate rock siding around the entrance. The entrance has over head cover on which a black sign with white lettering that reads "Building 600 Matthew Court" which is affixed overhead. The entrance way has a white rail fence in front. The entrance door is dark green in color. A sign posted to the right of front entrance of Building 600 reads "002-004, 101-104, 201-204" indicating that Apartment number 103 is located on the first floor of the building. (A Photograph of Liberty Woods, 600 Matthew Court, Apartment No. 103, MA is included as **Attachment A**)

### B.    Link to Target Subjects

58.    I believe that GUERRA and his associates use Liberty Woods, 600 Matthew Court, Apartment No. 103, MA 02184 uses this apartment to store controlled substances, including cocaine, drug proceeds, and other evidence concerning cocaine sales and distribution based upon the following facts: **1)** According to Postal Inspector MaCarran, the leasee for Apartment No. 103 has provided that the person authorized to retrieve the mail for Apartment No. 103 is CARLOS GONZALEZ (GONZALEZ-ORTIZ, a.k.a. "Marcial"). During the course of surveillance, GONZALEZ-ORTIZ, a.k.a. "Marcial" has been observed on multiple occasions operating a black Toyota Camry registered to CARLOS J. GONZALEZ-ORTIZ. As further described above, GONZALEZ-ORTIZ has been intercepted on multiple occasions with GUERRA in drug related conversations. **2)** On February 18, 2005, at 9:25 p.m., GUERRA made

an outgoing call to "Nata" (HERNANDEZ). During the intercepted call, GUERRA told "Nata" (HERNANDEZ) to keep going straight and to meet him at the "new apartment." At 9:44 p.m, GUERRA called "Nata" (HERNANDEZ) again to ask where he was. "Nata" (HERNANDEZ) said that he was about to get on the highway to go over there (to GUERRA's new apartment). Two minutes later at 9:46 p.m., GUERRA called "Nata" (HERNANDEZ) to ask how long they (HERNANDEZ and unidentified others) will be there (at GUERRA's new apartment). HERNANDEZ replied in "ten minutes." GUERRA then told "Nata" (HERNANDEZ) to hurry up and get there (to GUERRA's new apartment) because "they" said they would be there in fifteen minutes. GUERRA said he was already there (at the new apartment). At around 9:45 p.m., BPD Dets. Duggan and Walsh established surveillance in the area of the *Liberty Woods* apartment complex at 600 Matthew Court in Braintree, MA. At approximately, 10:25 p.m., Dets. Duggan and Walsh observed a Dodge wagon Magnum (NFI), bearing MA registration 63J-W31, leave the parking lot adjacent to Building No. 600 of the *Liberty Woods* condominium development. **3)** On March 2, 2005, law enforcement agents conducted physical surveillance of GUERRA's suspected stash location at the *Liberty Woods* at 600 Matthew Court in Braintree, MA. During this surveillance, agents observed GUERRA throw a box into the dumpster behind Building 600 (600 Matthew Court). Shortly thereafter, agents retrieved the box from the dumpster and found tin foil, plastic wrap, and paper napkins with a brown substance that is believed to be cinnamon used to mask the scent of the drugs. As further described above in paragraphs 19-22, on March 7, 2005, BPD seized four ounces of cocaine from two individuals that had distributed by GONZALEZ-ORTIZ, a.k.a. "Marcial." The cocaine seized was contained in tin foil and cinnamon. **4)** During a series of intercepted calls, beginning on April 1, 2005, a Hispanic male referred to as "Tobi" and/or "Jose Luis" and GUERRA discuss what is believed to be large shipment of cocaine destined for GUERRA in MA which is believed to be coming from somewhere in the southern United States. During an intercepted call on April 1, 2005, at 6:30 p.m., "Tobi" told GUERRA that Monday (April 4, 2005) at 6:00 in morning for sure. "Tobi"

27

said he was with "the guy." GUERRA said he would call tonight to tell him ("Tobi") how much (cocaine) they will do it. "Tobi" said the guy (who would be transporting the cocaine) was leaving today. GUERRA told "Tobi" not to worry. During an intercepted call on April 4, 2005, at 8:30 p.m., GUERRA stated that he was waiting on the person to bring him something here in Boston at "19" ($19,000). During another intercepted conversation the same day, "Tobi" told GUERRA that the guy (who would be delivering the cocaine to GUERRA) was in South Carolina. Based on the above intercepted phone calls, including the price of cocaine in the calls, I believe that GUERRA is expecting a large shipment of cocaine that is being transported from the southern United States to Boston that is being arranged by an unidentified male known as "Tobi" or "Jose Luis." I further believe, based on the intercepted conversations and physical surveillance that this shipment of cocaine will be taken to the target location, 600 Matthew Court, Apartment No. 103, which is believed to be GUERRA's primary stash location.

28

2. **162 Garfield Avenue, Hyde Park, MA 02136** (Residence of LEONEL GUERRA-PIMENTAL, a.k.a. "Leo")

A.    **Description Of Premises (Attachment B).**

59.    This is a red brick, row house-style building containing three addresses. Number 162 is the last address on the right-hand side of the front of the building. The windows have white trim. The front door is white, has the number "162" in black on it, and has a small landing in front of it, with a black railing and three steps leading to the ground. There is a light fixture hanging on the front of the address to the upper-left of the front door. There is a white storm door, with a window in the upper half, in front of the front door. (A Photograph of 162 Garfield Avenue is included as **Attachment B).**

B.    **Links To Target Subjects.**

60.    I believe that the primary residence of LEONEL GUERRA-PIMENTAL, a.k.a. "Leo" is 162 Garfield Avenue in the Hyde Park section of Boston and that GUERRA uses this residence as a place in which to store drug proceeds and other evidence relating to drug trafficking. My belief in this regard is based on the following facts: **1)** On the night of November 2, 2004, surveillance agents observed GUERRA driving a tan Ford Taurus in Hyde Park. The agents followed LEO as he drove to 162 Garfield Avenue in Hyde Park. **2)** On the afternoon of December 13, 2004, surveillance agents observed a male, later identified as Jaime Otero, exit from 162 Garfield Avenue, take a short drive in a red Ford Winstar, and then return to the Target Location. A short while later, agents observed Otero exit from the Target Location and drive away in the same tan Ford Taurus as GUERRA was observed driving on November 2, 2004. Agents followed Otero as he drove down Route 24 to Fall River. The car was stopped in that area by the Massachusetts State Police and Otero was arrested on state narcotics charges after the police recovered approximately 50 grams of cocaine from a hidden motorized compartment in the trunk behind the right rear seat. **3)** On the morning of February 18, 2005, GUERRA was intercepted having a drug-related conversation with HERNANDEZ. HERNANDEZ wanted to

29

know whether he should go over to GUERRA's (162 Garfield Avenue) to drop off the money before HERNANDEZ goes to see a customer named Edwin. GUERRA instructed HERNANDEZ to see the customer first and then go see GUERRA. **5)** On the afternoon of February 20, 2005, GUERRA was intercepted having a drug-related conversation with ANGEL VASQUEZ, a/k/a "Robertico." They discussed the fact that GUERRA had not received anything and that things were tough. GUERRA stated that he was "at home" and that he was "organizing some tickets here" (counting money) but that he would be going out after he takes a shower. **6)** On the evening of February 25, 2005, indicating that GUERRA intended to meet a Colombian source of supply in Hyde Park. GUERRA stated to an associate that he had to go home to get money. Surveillance agents observed GUERRA driving an Audi in Roslindale but he was lost in traffic. A surveillance agent subsequently observed GUERRA exit from the Target Location carrying a weighted plastic bag and drive from the area in the Audi. As set forth above, GUERRA was observed meeting with two men in Hyde Park and then driving them in the Audi to HERNANDEZ's apartment in Quincy. **6)** On the afternoon of March 11, 2005, GUERRA was intercepted having a drug-related conversation with GONZALEZ-ORTIZ, a.k.a. "Marcial" , who stated that he was at HERNANDEZ's apartment getting "it" and that HERNANDEZ was at Heidi's with the money (I believe that this is a reference to the Target Location as GUERRA resides there with a woman named Heidi Baez, with whom he has a minor child). GUERRA stated that he was at the store but that they should meet because "Marcial" is to go over to Lilo's (FLORTINO). In a subsequent call, GUERRA instructed "Marcial" to get the money ready at Heidi's (i.e., the Target Location) so that they can call those people. **7)** On the night of March 23, 2005, GUERRA was intercepted having a drug-related conversation with HERNANDEZ, who indicated that he was going to pass by GUERRA's house later to pick up the "650 pesos" for Tobi and the "2,000 pesos" that GUERRA is holding for HERNANDEZ.

3.    **Lincoln Heights Apartment Complex, 175-K Centre Street, Building 11, Apartment No. 1115, Quincy, MA (Residence of FERNANDO HERNANDEZ-GONZALEZ, a.k.a. "Nata")**

**A.    Description of premises (Attachment C)**

61.    The Lincoln Heights Apartment Complex is a series of approximately 15 buildings containing apartments located at 175 Centre Street in Quincy, MA. Building 11 is a three-story, wood structure, light blue in color with white trim, with a dark blue door under an overhang as a common entrance for all apartments. There is a red fire hydrant to the left front of the common front door and a detached white, metal box on a post, containing mailboxes for the apartments, to the right front of the common front door. There is a sign halfway up the building to the right of the common front door: the upper part of the sign contains the number "11" with the numbers "1101-1124" in black numbering and the lower part of the sign contains the numbers and letters "175K Center Street" in black. Apartment No. 1115 is located on the first-floor of the building to the right of the common front door. (A Photograph of this location is included as **Attachment C**).

**B.    Links To Target Subjects**

62.    I believe that the primary residence of FERNANDO HERNANDEZ-GONZALEZ, a.k.a. "Nata" is Apartment No. 1115 in Building 11 of the Lincoln Heights Apartment Complex located at 175 Center Street in Quincy, MA and that HERNANDEZ uses this residence to store drugs, including cocaine, drug proceeds, and other evidence concerning drug trafficking. My belief in this regard is based on the following facts: **1)** During this investigation, surveillance agents have observed HERNANDEZ frequently driving a dark blue Audi making what appear to be drug deliveries and money pick-ups and have observed the same vehicle parked at the Target Location: **2)** On the night of February 17, 2005, GUERRA was intercepted having a drug-related conversation with HERNANDEZ in which they discussed how much a particular drug customer owed to them; at one point, HERNANDEZ stated that he had "1200" at his house (believed to be $1,200 in drug proceeds); **3)** On the afternoon of February 19,

31

2005, GUERRA was intercepted having a drug-related conversation with a customer named Jason. At one point, Jason asked GUERRA-PIMENTAL to come over to his residence but then agreed with GUERRA's suggestion that he send HERNANDEZ over instead. Jason stated that he had some money and he then discussed with GUERRA-PIMENTAL how much cocaine "Nata" (HERNANDEZ) had delivered to him and how much another worker named "Marcial" had delivered to him. 4) On the evening of February 25, 2005, GUERRA and "Marcial" were intercepted having drug-related conversations indicating that GUERRA was going to meet a Colombian source of supply. Surveillance agents then observed GUERRA meet with two men in Hyde Park and then drive away with them in HERNANDEZ's Audi. Calls were intercepted indicating that the three men were driving from Hyde Park to HERNANDEZ's residence in Quincy. At one point, GUERRA called "Nata" (HERNANDEZ) and asked him for the exact location of his apartment. In response, HERNANDEZ stated that it was "Building 11, Apartment 1115." Surveillance then observed the Audi parked at the Target Location. GUERRA was then intercepted having a conversation with HERNANDEZ, who stated that the "calculator" and everything that belongs to them would be found inside a Gucci bag in the kitchen. A short time later, surveillance agents followed GUERRA as he used the Audi to drive the other two men from the Target Location back to the original meeting location in Hyde Park. 6) As further described above in paragraphs 19-22, on the night of March 7, 2005, GUERRA was intercepted having a drug-related conversation with HERNANDEZ, who stated that "this" is all broken in pieces like the other ones, soft. During a second conversation, HERNANDEZ stated that he's almost finished and that he got 22 out of it' GUERRA then instructed HERNANDEZ to give some to "Marcial" and to give some the next day to a customer in Lynn named Richard. Later that night, surveillance agents observed "Marcial" (GONZALEZ-ORTIZ) meeting with a drug customer in Roxbury. After GONZALEZ-ORTIZ left, agents observed the customer meeting with two men in another location. As the two men were driving away, they were stopped by the Boston police and were arrested on state narcotics charges after the police recovered

32

approximately four ounces of cocaine from their vehicle. **7)** On the afternoon of March 11, 2005, GUERRA was intercepted having a drug-related conversation with a customer named Benjamin. Benjamin stated that he needed some (drugs) and GUERRA agreed to meet him at HERNANDEZ's residence. In a subsequent conversation that afternoon, GUERRA was intercepted having a drug-related conversation with "Marcial" (GONZALEZ-ORTIZ). GUERRA stated that he and "Nata" (HERNANDEZ) were going to get "that thing" for Benjamin because Benjamin was desperate and he was going to give it to Benjamin from the ones he has there. **8)** During the afternoon and evening of March 12, 2005, GUERRA was intercepted having drug-related conversations with HERNANDEZ. They discussed HERNANDEZ delivering to various customers. For example, HERNANDEZ reported that a customer wanted more of the one that HERNANDEZ got him the last time and that the customer wanted a good price. In another call, GUERRA-PIMENTAL instructed HERNANDEZ to drop off "six" for a customer the next morning.

**4.    Lincoln Heights Apartment Complex, 175-G Centre Street, Building 7, Apartment No. 706, Quincy, MA (Residence of ARTURO ROSA, a.k.a. "Victor," a.k.a. "Peje"**

### A.    Description of premises (Attachment D)

63.    The Lincoln Heights Apartment Complex is a series of approximately 15 buildings containing apartments located at 175 Centre Street in Quincy, MA. Building 7 is a three-story, wood structure, light blue in color with white trim, with a dark blue door under an overhang as a common entrance for all apartments. There are at least two handicapped parking spaces immediately to the left of the front entrance to Building 7. There is a black and white sign halfway up the building on level with the second floor with the number "7" on top and the numbers and letters "175G Centre Street" in black. Apartment No. 706 is located on the second-floor in the front-side of the building. (A Photograph of this location is included as **Attachment D).**

### B.    Links To Target Subjects

64.    I believe that the primary residence of ARTURO ROSA, a.k.a. "Victor" is Apartment No. 706 in Building 7 of the Lincoln Heights Apartment Complex located at 175 Centre Street in Quincy, MA and that ROSA uses this residence to store drugs, including cocaine, drug proceeds, and other evidence concerning drug trafficking. My belief in this regard is based on the following facts: **1)** As further described above in paragraphs 42-46, based on intercepted conversations, ROSA is believed to be GUERRA's father-in-law and is believed to be receiving ounces quantities of cocaine from GUERRA for redistribution. **2)** During an intercepted call on March 19, 2005, at 4:53 p.m., GUERRA received an incoming call from "Victor," a.k.a. "Peje." (ROSA) and told "Leo" (GUERRA) that he wanted to talk business. During a more than seven minute conversation, "Victor" explained to "Leo" that he wanted him (GUERRA) to provide ROSA with kilogram quantities of cocaine instead of just ounces because it was getting too expensive. Both Victor and Leo discussed the calculations for the price of a kilogram of cocaine and the profit margin that GUERRA had been receiving from selling

34

cocaine. **3)** During an intercepted call on March 28, 2005, at 11:18 a.m., GUERRA told "Nata" (HERNANDEZ) to put the "pretty stuff" (good quality drugs) for the one that he (HERNANDEZ) was going to see in Boston. "Nata" (HERNANDEZ) then asked "Leo" (GUERRA) who was in line. GUERRA said it was "Flaco." "Nata" (HERNANDEZ) said he already spoke with him ("Flaco"). "Nata" (HERNANDEZ) said that he would see then "Peje" (ARTURO ROSA, a.k.a. "Victor"). GUERRA instructed "Nata" to go see "Peje" (ROSA) first. At 12:20 p.m., "Nata" (HERNANDEZ) called "Leo" (GUERRA) and asked "Leo" for the apartment number for "Peje" (ROSA, a.k.a. "Victor"). GUERRA replied, "706." **4)** The same day, March 28, 2005, at approximately 12:22 p.m., DEA SA Hersey observed HERNANDEZ arrive at the *Lincoln Heights* apartment complex in Quincy, MA driving the blue Audi and park in front of Building No. 6. SA Hersey observed HERNANDEZ walk up to the front door of Building No. 7, push the intercom entry button, and enter shortly thereafter. At around 12:27 p.m., SA Hersey saw HERNANDEZ walk out of Building No. 7 and observed talking on a cell phone. Thereafter, HERNANDEZ got back into the blue Audi. SA Hersey followed HERNANDEZ to the area of Hyde Park, MA. Later that evening, at around 7:45 p.m., SA Hersey returned to the *Lincoln Heights* apartment complex and saw two vehicles, a green Plymouth Breeze, and black Ford Escape, parked in front of Building No. 7, both of which were registered to ARTURO ROSA. **5)** More recently, during an intercepted call on April 3, 2005, at 2:08 p.m., ROSA told GUERRA that he had GUERRA's money but asked GUERRA to bring the same prescription tomorrow before 12:00 p.m (at ROSA's location). ROSA then said that if GUERRA needed the money, GUERRA could send for it this afternoon or get it tomorrow. GUERRA said he would get it tomorrow.

35

**D.    CONCLUSION**

65.    Based on the information contained in this affidavit, I submit that there is probable cause to believe that: **(A)** (1) LEONEL ESMENDY GUERRA-PIMENTEL, a.k.a. "Leo," a.k.a. Jose Alfredo Santiago; (2) FERNANDO HERNANDEZ-GONZALEZ, a.k.a. "Nata," (3) CARLOS J. GONZALEZ-ORTIZ, a.k.a. "Marcial," a.k.a. Francisco Diaz (4) ANGEL R. VASQUEZ, a.k.a. "Robertico," a.k.a. "Roberto," a.k.a. Milton J. Martinez; (5) ARTURO ROSA, a.k.a. "Victor," a.k.a. "Peje"; (6) LUIS MANUEL GONZALEZ-CALDERON, a.k.a. "Gordo," a.k.a. Rafael Jimenez; (7) MANUEL FLORENTINO, a.k.a. "Lilo" and (8) WILLIAM MARTINEZ, a.k.a. "Loro," a.k.a. "Lorito" have committed the crime of conspiracy to distribute five kilograms or more cocaine, a Scheduled II controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A)(ii) as set forth in the accompanying criminal complaint; and **(B)** the above described four locations, further described in **Attachments A** through **D,** contain evidence, proceeds, and contraband relating to the possession, distribution, and trafficking of cocaine and other evidence tending to prove that the above listed target subjects have violated 21 U.S.C. §846.

I declare that the foregoing is true and correct.

Mark Tully
Special Agent
U.S. Drug Enforcement Administration

Subscribed and sworn to
before me this 6TH day of
April 2005.

UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

36

**Attachment A**
**Liberty Park**
**One Matthew Lane**
**Building 600, Apartment No. 103,**
**Braintree, MA 02184**

*Liberty Park* is a series of two and three level apartment buildings located approximately a half mile from the intersection of Liberty Street and Grove Street in Braintree, MA.  Apartment number 103 is located on the first floor of Building 600.  Building 600 is a two story structure at the entrance which flows into a three story structure.  Building 600 has aluminum siding off-white in color with slate rock siding around the entrance. The entrance has over head cover on which a black sign with white lettering that reads "Building 600 Matthew Court" which is affixed overhead.  The entrance way has a white rail fence in front.  The entrance door is dark green in color.  A sign posted to the right of front entrance of Building 600 reads "002-004, 101-104, 201-204" indicating that Apartment number 103 is located in the building.



**Attachment A-1**
**Liberty Park**
**One Matthew Lane**
**Building 600, Apartment No. 103,**
**Braintree, MA 02184**

<u>**Items to Be Seized**</u>

1.   Controlled substances, including cocaine;

2.   Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, bundling materials and heat-sealing devices;

3.   Hidden compartments including electronically operated hidden compartments;

4.   Cash, U.S. currency; books and papers reflecting debts and collections relating to monies owed or due for the distribution of controlled substances; and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, safety deposit keys and deeds to real property;

5.   Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

6.   Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

7.   The following items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location: (a) Utility bills; (b) Telephone bills; (c) Leases; (d) Rental agreements; and (e) photographs of the Target Subjects.

## ATTACHMENT B

This is a red brick, row house-style building containing three addresses. Number 162 is the last address on the right-hand side of the front of the building. The windows have white trim. The front door is white, has the number "162" in black on it, and has a small landing in front of it, with a black railing and three steps leading to the ground. There is a light fixture hanging on the front of the address to the upper-left of the front door. There is a white storm door, with a window in the upper half, in front of the front door.



**Attachment B-1**
**162 Garfield Avenue**
**Hyde Park, MA 02136**

<u>**Items to Be Seized**</u>

1.    Hidden compartments including electronically operated hidden compartments;

2.    Cash, U.S. currency; books and papers reflecting debts and collections relating to monies owed or due for the distribution of controlled substances; and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, safety deposit keys and deeds to real property;

3.    Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

4.    Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

5.    The following items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location: (a) Utility bills; (b) Telephone bills; (c) Leases; (d) Rental agreements; and (e) photographs of the Target Subjects.

## ATTACHMENT C

The Lincoln Heights Apartment Complex is a series of approximately 15 buildings containing apartments located at 175 Centre Street in Quincy, MA. Building 11 is a three-story, wood structure, light blue in color with white trim, with a dark blue door under an overhang as a common entrance for all apartments. There is a red fire hydrant to the left front of the common front door and a detached white, metal box on a post, containing mailboxes for the apartments, to the right front of the common front door. There is a sign halfway up the building to the right of the common front door: the upper part of the sign contains the number "11" with the numbers "1101-1124" in black numbering and the lower part of the sign contains the numbers and letters "175K Center Street" in black. Apartment No. 1115 is located on the first-floor of the building to the right of the common front door.



**Attachment C-1**
**Lincoln Heights Apartment Complex**
**175-K Centre Street, Building 11, Apartment No. 1115,**
**Quincy, MA 02169**

**Items to Be Seized**

1.   Controlled substances, including cocaine;

2.   Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, bundling materials and heat-sealing devices;

3.   Cash, U.S. currency; books and papers reflecting debts and collections relating to monies owed or due for the distribution of controlled substances; and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, safety deposit keys and deeds to real property;

4.   Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

5.   Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

6.   The following items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location: (a) Utility bills; (b) Telephone bills; (c) Leases; (d) Rental agreements; and (e) photographs of the Target Subjects.

**Attachment D**
**Lincoln Heights Apartment Complex**
**175-G Centre Street, Building 7, Apartment No. 706,**
**Quincy, MA 02169**

The Lincoln Heights Apartment Complex is a series of approximately 15 buildings containing apartments located at 175 Centre Street in Quincy, MA. Building 7 is a three-story, wood structure, light blue in color with white trim, with a dark blue door under an overhang as a common entrance for all apartments. There are at least two handicapped parking spaces immediately to the left of the front entrance to Building 7. There is a black and white sign halfway up the building on level with the second floor with the number "7" on top and the numbers and letters "175G Centre Street" in black. Apartment No. 706 is located on the second-floor in the front-side of the building.



**Attachment D-1**
**Lincoln Heights Apartment Complex**
**175-G Centre Street, Building 7, Apartment No. 706,**
**Quincy, MA 02169**

<u>**Items to Be Seized**</u>

1.   Controlled substances, including cocaine;

2.   Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, bundling materials and heat-sealing devices;

3.   Cash, U.S. currency; books and papers reflecting debts and collections relating to monies owed or due for the distribution of controlled substances; and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, safety deposit keys and deeds to real property;

4.   Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

5.   Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

6.   The following items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location: (a) Utility bills; (b) Telephone bills; (c) Leases; (d) Rental agreements; and (e) photographs of the Target Subjects.